FILED

2008 Mar-31  PM 01:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

REM DIRECTIONAL, INC., and    )
REM PIPELINE SERVICES, INC.,  )
                              )
        Plaintiffs,           )
                              )
vs.                           )          Case No.  7:06-cv-1713-TMP
                              )
20/20 PAYROLL SOLUTIONS, INC., )
STEPHEN TAYLOR, BRENT TIBBETTS, )
                              )
        Defendants            )

## MEMORANDUM OPINION CONTAINING
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause came before the court for a non-jury trial on the question of damages to be awarded the plaintiffs following entry of summary judgment as to liability against defendant 20/20 Payroll Solutions, Inc, on August 9, 2007, and defendants Stephen Taylor and Brent Tibbetts on January 7, 2008, respectively.  The parties consented to the exercise of dispositive jurisdiction by the undersigned magistrate judge and waived their respective demands for a jury trial.  Consequently, on March 10, 2008, the court conducted a non-jury trial to determine the damages to which the plaintiffs are entitled.

Findings of Fact

1.  Defendant 20/20 Payroll Solutions, Inc. (hereinafter "20/20"), was hired by plaintiffs REM Directional, Inc. (hereinafter "REM-D"), and REM Pipeline Services, Inc. (hereinafter "REM-PS")

to provide both companies with payroll services. This service entailed REM-D and REM-PS reporting to 20/20 the number of hours worked by their employees on a periodic basis. 20/20 would then calculate the payroll for each company, cut the payroll checks to be delivered to the employees, and report to the IRS the § 941 employment taxes owed by each employer. To cover the payroll checks it issued, 20/20 was authorized to debit the bank accounts of REM-D and REM-PS in the amounts necessary to make the payroll. On a quarterly basis, 20/20 also was responsible for debiting the employers' bank accounts and paying to the IRS the quarterly § 941 employment taxes owed by the employers with respect to their employees.

2. Defendant 20/20 was founded and operated by defendants Tibbetts and Taylor. During all times material to this case, Tibbetts was the CEO of 20/20 and Taylor was the president. Both exercised day-to-day management over 20/20 operations.

3. Beginning in May 2006, the payroll checks of some of plaintiffs' employees began to "bounce." When presented for payment against the 20/20 account, the payroll checks were rejected on the basis of non-sufficient funds. These payroll checks were ultimately replaced by REM-D and REM-PS company checks.

4. In late 2006 or early 2007, REM-D and REM-PS were notified by the IRS that they were delinquent in the payment of their first- and second-quarter 2006 § 941 employment tax payments. These were tax deposits that 20/20 was supposed to make on behalf of the plaintiffs under its contract to provide payroll services, and, in fact, had debited from plaintiffs' bank accounts as if payment to the IRS had been made. Both plaintiffs immediately began an investigation, only to

2

discover that 20/20 was out of business and Tibbetts and Taylor had been charged criminally in connection with their operation of 20/20's payroll services.

5.  In May 2007, an IRS collection agent appeared at the plaintiffs' business premises for the purpose of imposing a lien on plaintiffs' assets for the collection of the unpaid employment taxes. At that time, the plaintiffs negotiated an agreement with the IRS to pay $5,000 of the unpaid employment tax immediately and the balance within fifteen (15) days.  Plaintiffs thereafter made the required payments to the IRS, even though comparable sums already had been deducted from their bank accounts by 20/20 in 2006 but never paid to the IRS by 20/20.

6.  As late as the summer of 2006, 20/20 and Taylor and Tibbetts continued to report falsely to plaintiffs that all required payroll tax deposits with governmental agencies were being made.

7.  Plaintiffs engaged the services of their CPA to audit the tax deposits not made by 20/20 to determine the amount of loss suffered.  The CPA, David Turnipseed, confirmed that a total of $89,641.84 in employment taxes due from REM-D had not been paid by 20/20 for the first and second quarters of 2006.  Interest and penalties were assessed by the IRS in the amount of $11,884.94, bringing the total payment owed by REM-D to $101,526.78.

8.  Likewise, Turnipseed confirmed that a total of $81,548.63 in taxes owed by REM-PS had not been paid.  With interest and penalties in the amount of $11,022.46 assessed by the IRS, the total owed by REM-PS was $92,571.09.

9.  In August 2007, IRS Special Agent Denise Coxe reported that defendants Tibbetts and Taylor had been ordered by the United States District Court for the Northern District of Georgia to

pay restitution to the plaintiffs, as part of their criminal sentences, the amounts of $109,748.55 to REM-D and $90,130.97 to REM-PS.

10.   In addition to the employment tax payments made by plaintiffs, they each incurred professional fees to Turnipseed for his audit of plaintiffs' tax obligations to the IRS.  These services continued through May, June, and July of 2007.  Turnipseed testified that his fees reflected on Plaintiffs' Exhibits 7 & 14 involved audit activities up through the August 6, 2007, billing cycle, but thereafter his fees were primarily for litigation support in connection with this case.  Accounting fees through the August 6, 2007, billing cycled totaled $10,672.50 for REM-D and $5,832.50 for REM-PS.

11.   Plaintiffs also claim damage in the form of lost use value for the money they were required to pay the IRS in replacement of the sums that 20/20 failed to pay during the first and second quarters of 2006.  Turnipseed calculated this lost-use value by assuming that if plaintiffs had not been required to pay the IRS the sums of $101,526.78 for REM-D and $92,571.09 for REM-PS, plaintiffs would have been able to use the money to reduce other debts on equipment which was accruing interest at the rate of prime plus 1%.  Calculated in this manner, the "lost-use" value of the money paid to the IRS was $7,093.98 for REM-D and $6,235.29 for REM-PS.

12.  Also, as already mentioned, REM-D and REM-PS were forced to "pick up" at least ten payroll checks issued by 20/20 and delivered to their employees that bounced.  Plaintiffs replaced these worthless payroll checks with company checks totaling $4,333.50.

4

Conclusions of Law

The calculation of the actual sums of money paid to the IRS to replace the employment tax deposits negligently lost by 20/20 and Tibbetts and Taylor is without controversy.  Defendants do not challenge the correctness of the figures that REM-D paid $101,526.78 in taxes, penalties, and interest, or that REM-PS paid $92,571.09.  Rather, defendants make two arguments: (1) that a judgment in this case, in addition to the restitution Tibbetts and Taylor have been ordered to pay as part of their criminal sentences, will allow plaintiffs to obtain a double recovery of their loss, and (2) the amounts of accounting fees and "lost-use" value of money claimed by the plaintiffs as forms of damage that flowed naturally and proximately from the negligence of the defendants are overstated.

A.  Restitution and Double Recovery

The court previously addressed and rejected this argument in granting partial summary judgment to the plaintiffs against the individual defendants Tibbetts and Taylor.   In that memorandum opinion, the court wrote:

> Defendants further argue that plaintiffs are not entitled to summary judgment against the individual defendants because the defendants have entered into restitution and forfeiture agreements with the government, and that plaintiffs would receive a "double recovery" if they prevail on these claims.  This argument was addressed in the court's previous opinion resolving the motion for partial summary judgment against 20/20, and need not be repeated here.  Clearly, however, to the extent that Tibbetts and Taylor *actually pay* restitution, they would be entitled to an offset or credit against this judgment.  Further, as noted previously, the restitution and forfeiture agreements appear to call for restitution only with respect to the losses plaintiffs suffered due to 20/20's failure to timely and properly pay the IRS; there does not appear to be any restitution agreement with respect to lost or converted money that was intended to fund plaintiffs' employees' paychecks.  Thus, it may be that the restitution agreements executed by Tibbetts and Taylor simply do not cover

some parts of the loss suffered by plaintiffs, and they are entitled to seek recovery of that additional loss.

(Doc. 49, p. 10).  The possibility of a double recovery for at least part of the damages incurred by plaintiffs does not require that they not obtain a judgment for their full damages.  Rather, the proper remedy to avoid a double recovery is to offset or credit any restitution payments against this judgment, in the event any restitution payments are ever made.  Indeed, 18 U.S.C. § 3664(j)(2) seems to anticipate this concern by providing, "Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in — (A) any Federal civil proceeding; and (B) any State civil proceeding, to the extent provided by the law of the State."  See also United States v. Hasson, 333 F.3d 1264, 1275 (11th Cir. 2003); United States v. Lee, 427 F.3d 881, 895 (11th Cir. 2005) ("When considering the impact of recovered collateral, or the return of money, property, or services, to the victim, the Guidelines treat those so recovering as having suffered a loss but then allow the defendant to take credit against the total loss for the value of the recovered or returned loss.").

Similarly, it is clear that the amount of restitution order by the court in Atlanta is not the same amount as the damages incurred by plaintiffs.  Even defendants admit that the restitution covered only the amount of taxes, penalties, and interest owed the IRS; it did not include the other damages suffered by plaintiffs — replaced payroll checks, accounting fees, and "lost-use value" of money — that flowed naturally and proximately from the defendants' wrongs.  Thus, the restitution order does not provide a full remedy for the plaintiffs, and they are entitled to a judgment for all of their

damages, subject to crediting the defendants with any payments they actually make toward the restitution order.

### B.  Calculating Total Damages

As mentioned above, defendants do not contest the amount of back taxes, interest and penalties plaintiffs were required to pay the IRS in the summer of 2007 to replace the tax deposits 20/20 never made.  They do, however, contest the other forms of damages claimed by plaintiffs — the accounting fees paid to Turnipseed, the "lost-use value" of the money paid to the IRS, and the replaced payroll checks.

Looking first at the accounting fees claimed by plaintiffs, the testimony was clear that these fees were incurred by plaintiffs initially to investigate and correct the problems 20/20's defalcation caused with the IRS.  Plaintiffs were required to use the accountant to reconstruct their first- and second-quarter 2006 payroll records and employment tax liability in order to rectify their situation with the IRS.  These fees, therefore, flowed naturally and proximately from the negligent failure of defendants to properly pay the employment taxes as required.

Just as clearly, however, Turnipseed testified that this auditing activity was substantially completed by August 2007, and that his billings to the plaintiffs after August covered litigation support, rather than accounting necessitated by the missing tax payments.  Such litigation support would not be damages that naturally and proximately flowed from the defendants' negligence, but litigation expenses that are not part of the damages a plaintiff may seek.  Accordingly, the court will include in the award of damages only those accounting fees reflected in Plaintiff's Exhibits 7 and 14 through the August 6, 2007, billing cycle.  Fees billed after August 6, 2007, will not be awarded

as part of the damages for which the plaintiffs seek judgment.  Thus, the amount of accounting fees

that plaintiffs may recover are $10,672.50 for REM-D and $5,832.50 for REM-PS.

The court also believes that while plaintiffs are entitled to some compensation for the lost

value of the money they were required to pay to replace tax deposits not made by 20/20, it is not

calculated on the basis of prime plus 1 % interest.  The Alabama Supreme Court noted in Nelson v.

AmSouth Bank, N.A., 622 So. 2d 894 (Ala.,1993), that:

> At common law, prejudgment interest is allowable at the legal rate in noncontract
> cases where the damages can be ascertained by mere computation, or where the
> damages are complete at a given time so as to be capable of determination at such
> time in accordance with known standards of value.  See Lapeyrouse Grain Corp. v.
> Tallant, 439 So. 2d 105 (Ala.1983) (allowing prejudgment interest in action claiming
> damages for breach of contract, conversion, and fraud); see, also, Atlanta &
> Birmingham A.L. Ry. v. Brown, 158 Ala. 607, 48 So. 73 (1908) (allowing
> prejudgment interest for negligent damage to crops).

Id. at 895-896.  Ultimately, the court awarded interest to the plaintiff in Nelson at the legal rate (6%

per annum) for the bank's negligent payment of her portion of a bank account to another.  See

Alabama Code § 8-8-1 (1975).

Plaintiffs damages were complete "so as to be capable of determination at such time in

accordance with known standards of value" when they completed their payments to the IRS in June

2007 for unpaid employment taxes, interest, and penalties owed to the IRS as a result of defendants'

negligent failure to make the payments during the first and second quarters of 2006.  Those sums can

be readily determined from the payments themselves, totaling $101,526.78 paid by REM-D and

$92,571.09 paid by REM-PS.  Prejudgment interest at the legal rate of 6% per annum (or the rate of

0.005 per month) is easily calculated from June 2007 to the date of this judgment nine months later.

8

Thus, REM-D is entitled to prejudgment interest in the amount[1] of $4,568.71, and REM-PS is entitled to prejudgment interest of $4,165.70.[2]

Finally, plaintiffs claim they are entitled to be reimbursed for the payroll checks they "pick up" from their employees when the payroll checks issued by 20/20 bounced. There were ten separate "bounced" payroll checks to three employees, Nickerson, Smith, and Jordan, but it is not clear whether they were employees of REM-D or REM-PS. In other words, it is not clear which plaintiff paid what portion of the sum necessary to replace the payroll checks of these employees. Because each plaintiff has the burden of proving its entitlement to relief, each has failed to show that it (as distinct from the other) incurred this loss. While it appears that one or both of the plaintiffs paid this money (after having 20/20 deduct and negligently lose money to make the payroll checks), the court is unable to determine which of the plaintiffs is entitled to recover what part of the sum as damages. For this reason, the court cannot include this amount in the award of damages.

Based upon the foregoing findings of fact, conclusions of law, and mathematical calculations, the court finds that the plaintiffs are entitled to an award of damages against the defendants, jointly and severally, as follows:

| Plaintiff | REM Directional, Inc |
|---|---|
| Taxes, etc. paid to IRS | $101,526.78 |
| Accounting Fees | $ 10,672.50 |
| Prejudgment Interest | $   4,568.71 |
| TOTAL DAMAGES | $116,767.99 |

---

[1]  The amount is calculated by multiplying $101,526.78 (the payment made to the IRS) by the interest rate of .005 per month times 9 months (June 2007 through March 2008).

[2]  The amount is calculated by multiplying $92,571.09 (the payment made to the IRS) by the interest rate of .005 per month times 9 months (June 2007 through March 2008).

| Plaintiff | REM Pipeline Services, Inc |
|---|---|
| Taxes, etc. paid to IRS | $ 92,571.09 |
| Accounting Fees | $  5,832.50 |
| Prejudgment Interest | $  4,165.70 |
| TOTAL DAMAGES | $102,569.29 |

Separate Final Judgments will be entered for each plaintiff in these amounts and jointly and severally against the three defendants.

DONE this 31st day of March, 2008.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE

10